## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

JOE THOMAS, JR., and
JP THOMAS CONSTRUCTION LTD,               CV 11-40-M-DWM-JCL
a Montana corporation,

                Plaintiff,               FINDINGS &
                                           RECOMMENDATION
                                           OF UNITED STATES
      vs.                               MAGISTRATE JUDGE

NAUTILUS INSURANCE
COMPANY, and DOES 1 through 3,

              Defendants.

_____

This insurance dispute comes before the Court on the parties' cross-motions

for summary judgment on the question of whether Defendant Nautilus Insurance

Company had a duty to defend Plaintiffs Joe Thomas, Jr. and JP Thomas

Construction Ltd. (collectively "Thomas") under a commercial general liability

policy.  For the reasons set forth below, Nautilus's motion for summary judgment

should be denied, and Thomas's cross-motion for partial summary judgment

should be granted.

## I.  Background

In February 2006, Thomas contracted to build a home for Jane Ryan

("Ryan") on her property in Flathead County, Montana.   Dkt. 16-2, at 7-10.

Thomas began construction in the spring of 2006 and obtained two consecutive

Commercial General Liability policies from Nautilus, the first of which went into

effect on September 1, 2006, for a one year period.[1]  At some point, Thomas hired

a subcontractor, McConnell Drywall ("McConnell"), to finish the interior walls of

the house with sheetrock.  Dkt. 16-11, ¶ 3.  In the spring of 2007, and with the

house only partially completed, Thomas stopped construction.  Dkt. 16-11, ¶ 3.

 In January 2008, Ryan filed suit against Thomas in state court, asserting

claims for negligence, breach of contract, breach of the implied covenant of good

faith and fair dealing, constructive fraud, and conversion.[2]  Dkt. 5.  In particular,

Ryan alleged that Thomas had "negligently construct[ed] her home and caused her

"injury and damage."  Dkt. 5, ¶¶ 9-10.  Ryan also claimed that Thomas had

breached their "agreement by failing to complete construction of [her] home,"

---

[1] The second policy was in effect from September 1, 2007 to September 1,
2008, and is identical to the first policy in all material respects. Dkt. 9-1, at 2.
According to Thomas, however, only the first policy period is at issue here.  Dkt.
13, at 2.  Because Thomas does not claim that Nautilus breached its duty to defend
under the second policy or premise any of his claims on that policy, for purposes
of this discussion the Court will simply refer to the first policy (hereinafter
"Policy").

[2] Because Ryan never served her original complaint on Thomas, the parties
agree that the controlling pleading is her Amended Complaint (hereinafter
"complaint").

overcharging her for materials, and "performing the construction in a negligent manner." Dkt. 5, ¶14. Ryan next alleged that Thomas had breached the implied covenant of good faith and fair dealing "by not being honest with [her,] and by not observing reasonable commercial standards of fair dealing in the construction trade." Dkt. 16-2, ¶ 17. Finally, Ryan accused Thomas of constructive fraud and conversion on the ground that he had allegedly diverted a portion of the funds she had paid for the construction of her home to other uses. Dkt. 5, ¶¶ 23, 29.

In late September 2008, the attorney who Thomas had hired to defend him against Ryan's lawsuit tendered those claims to Nautilus for defense and indemnification. Dkt. 16-3. Nautilus refused to defend, however, and denied coverage based on various exclusions in the Policy. Dkt. 16-4. Thomas's counsel apparently wrote back in January 2009, asserting coverage under the Policy's products-completed operations hazard provision, but Nautilus continued to deny coverage or a defense. Dkt. 16-5.

In May 2010, Thomas's counsel once again requested that Nautilus provide a defense, and reiterated his position regarding coverage under the Policy's products-completed operations hazard provision. Dkt. 16-5. He also provided Nautilus with a copy of Ryan's responses to Thomas's first discovery requests. Although Ryan had completed those discovery responses some two years earlier,

Thomas's counsel explained that he had since come to learn that a construction defect for which Ryan was seeking recovery had been caused by McConnell, the sheet rock subcontractor. Dkt. 16-5. Because the defect was allegedly caused by a subcontractor, counsel for Thomas took the position that the Policy's general liability coverage also applied. Dkt. 16-5, at 2.

After receiving this letter, Nautilus retained counsel to review the matter and determine whether it had a duty to defend or indemnify Thomas under the Policy. Dkt. 16-6. In late June 2010, Nautilus, through its counsel, advised Thomas that it was still denying a defense and indemnification. Dkt. 16-6.

In the meantime, Ryan and Thomas continued to litigate their underlying dispute. The case went to trial in September 2010, and resulted in a defense verdict. Dkt. 16-10. Although Thomas prevailed at trial, by that time he had incurred defense costs and attorney fees in the amount of $82,982.91. Dkt. 16-10. In January 2011, Thomas commenced this action against Nautilus in state court in an effort to recover those costs.

Nautilus subsequently removed the case to this Court based on diversity jurisdiction. Thomas alleges breach of contract based on Nautilus's failure to defend and indemnify him, constructive fraud, and violations of Montana's Unfair Trade Practices Act, M.C.A. §§ 33-18-201 et. seq. Nautilus moves for summary

judgment on the ground that it had no duty to defend or indemnify Thomas in the underlying lawsuit because the Policy's so-called "business risk" exclusions clearly precluded coverage for Ryan's claims. Absent any such duty to defend or indemnify, Nautilus takes the position that Thomas's claims for breach of contract, constructive fraud, and unfair trade practices necessarily fail as a matter of law.

Thomas has cross-moved for partial summary judgment, asking the Court to rule as a matter of law that Nautilus breached its duty to defend him under the Policy and is liable for all resulting damages, including the defense costs he incurred in the underlying lawsuit.

## II.    Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one

conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

When presented with cross-motions for summary judgment, the Court must "evaluate each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *ACLU v. City of Law Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003) cert. denied 540 U.S. 1110 (2004).

## III.    Discussion

It is worth noting at the outset that the parties' cross-motions for summary

judgment differ in one material respect – Nautilus seeks a ruling that it had no

duty under the Policy to either defend or indemnify Thomas, while Thomas has

confined his motion to the duty to defend issue. The Montana Supreme Court has

made clear that the duty to defend and the duty to indemnify are separate

obligations.[3]

Fundamentally speaking, "[t]he duty to defend is independent from and

broader than the duty to indemnify created by the same insurance contract."

*United National Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 214 P.3d 1260, 1269

(Mont. 2008). The duty to defend "arises when an insured sets forth facts that

represent a risk covered by the terms of an insurance policy." *United National*,

214 P.3d at 1269. In other words, where the insured "alleges facts, which if

proven, would result in coverage," then the insurer has a duty to defend. *Plum*

*Creek Marketing, Inc. v. American Economy Ins. Co.*, 214 P.3d 1238, 1247 (Mont.

2009). While the duty to defend thus "arises where the alleged facts even

potentially fall within the scope of coverage,...the duty to indemnify does not arise

---

[3] Sitting in diversity jurisdiction, this Court looks to the substantive law of
Montana as the forum state for purposes of the ensuing analysis. *See Medical
Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306
F.3d 806, 812 (9th Cir. 2002).

unless the policy actually covers the alleged harm." *Skinner v. Allstate Ins. Co.,*
127 P.3d 359, 363 (Mont. 2005) (quoting *Constitution Assocs. v. New Hampshire*
*Ins. Co.*, 930 P.2d 556, 562-63 (Colo. 1996).

This means that "[w]here there is no duty to defend, it follows that there can
be no duty to indemnify." *Skinner v. Allstate Ins. Co.,* 127 P.3d 359, 363 (Mont.
2005) (quoting *Constitution Assocs.*, 930 P.2d at 562-63. But "where there is a
duty to defend, there is not necessarily a duty to indemnify." *Skinner*, 127 P.3d at
363 (quoting *Constitution Assocs.*, 930 P.2d at 562-63). Even assuming, for
example, that a court concludes as a preliminary matter "that an insurer must
defend the insured, a fact-finder may later reach a decision on the disputed facts
and conclude that an insurer has no duty to indemnify." *Skinner,* 127 P.3d at 363.

"The duty to defend is triggered more easily than is the duty to indemnify."
*Skinner*, 127 P.3d at 364 (quoting *Constitution Assocs.*, 930 P.2d at 562-63). In
determining whether the duty to defend has been triggered in any given case, the
court must liberally construe the allegations in the underlying complaint "so that
all doubts about the meaning of the allegations are resolved in favor of finding that
the obligation to defend was activated." *Farmers Union Mut. Ins. Co. v. Staples*,
90 P.3d 381, 385 (Mont. 2004). And in light of "[t]he fundamental protective
purpose of an insurance policy and the obligation of the insurer to provide a

defense," courts are to narrowly construe any coverage exclusions. *Staples*, 90 P.3d at 385. Unless there is "an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend." *Staples,* 90 P.3d at 385.

Even when the underlying "complaint does *not* present a claim which on its face is covered by the policy," an insurer may have a duty to defend if it is aware of factual information that would otherwise trigger such a duty. *Revelation Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 926 (Mont. 2009) (emphasis in original). Thus, in Montana, a court must consider – in addition to the complaint – facts that were known to the insurer in determining whether the insurer had a duty to defend.

In the words of the Montana Supreme Court, "[a]n insurer cannot ignore knowledge of facts that may give rise to coverage under the policy simply because the complaint – which is, after all, drafted by a claimant over whose draftsmanship the insured has no control – does not allege these facts of which the insurer has knowledge." *Revelation Industries*, 206 P.3d at 928. While insurers are not required "to seek out such information," they are not at liberty "to simply ignore factual information supplied to them by their insured but not alleged in the complaint or petition, where those facts would trigger a duty to defend."

*Revelation Industries*, 206 P.3d at 926.

If an insurer has a duty to defend one claim, it must defend against all claims even if there is no possibility that those remaining claims would be covered. *See e.g. Home Ins. Co. v. Pinski Bros., Inc.*, 500 P.2d 945, 949-50 (Mont. 1972).

Citing these liberal standards, Thomas takes the position that Nautilus had a duty to defend him because Ryan's complaint alleged facts that, if proven, could have come within the Policy's products-completed operations hazard coverage. Even if the complaint itself did not adequately allege facts that might potentially fall within the scope of coverage, Thomas maintains that the extrinsic factual information contained in the discovery responses he later sent to Nautilus was sufficient to trigger the insurer's duty to defend. Nautilus disagrees, and argues it had no duty to defend Thomas because the Policy's business risk exclusions – even when supplemented by the factual information set forth in Ryan's discovery responses – clearly and unequivocally precluded coverage for Ryan's claims.

## A.    Insuring Agreement

The Policy's basic insuring agreement identifies certain prerequisites to coverage, providing in relevant part that Nautilus "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or

'property damage' to which this insurance applies," so long as that damage "is caused by an 'occurrence'..." Dkt. 9-3, at 11. Because Nautilus takes the view that the Policy's exclusions preclude coverage even if the insuring agreement's requirements are satisfied, it assumes for purposes of its own motion that Ryan's claims were for "bodily injury" or "property damage" caused by an "occurrence." But because Thomas must at least show the potential for coverage to prevail on his cross-motion for summary judgment, he cannot bypass this threshold provision. Thomas thus begins by arguing that Ryan's claims were for "property damage" caused by an "occurrence" as contemplated by the Policy.

As always, "the interpretation of an insurance contract presents a question of law." *Moodroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, ¶ 24 (Mont. 2008). The Court must interpret the Policy's terms "according to their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Allstate Ins. Co. v. Wagner-Ellsworth*, 188 P.3d 1042, ¶ 16 (Mont. 2008) (quoting *Stutzman v. Safeco Ins. Co. of America*, 945 P.2d 32, 34 (Mont. 1997)). In doing so, the Court "may not rewrite the contract at issue, but must enforce it as written if its language is clear and explicit." *Allstate Ins. Co.*, at ¶ 16. If the terms of the Policy are ambiguous, however, that ambiguity must be strictly construed against the insurer and in favor of extending coverage.

*Stutzman*, 945 P.2d at 34; *Mitchell v. State Farm Ins. Co.*, 68 P.3d 703, 709 (Mont. 2003). "An '[a]mbiguity exists only when the contract taken as a whole or in its wording or phraseology is reasonably subject to two different interpretations.'" *Farmers Alliance Mut. Ins. Co. v. Holeman*, 961 P.2d 114, ¶ 25 (Mont. 1998).

To trigger the initial grant of coverage provided for by the insuring agreement, Ryan would have had to allege "property damage" as the result of an "occurrence" as those terms are defined by the Policy. Thomas does not argue that Ryan's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, constructive fraud, or conversion alleged "property damage" caused by an "occurrence." Thomas effectively concedes that those claims did not trigger the insuring agreement, and does not argue that they gave rise to a duty to defend.

Thomas instead focuses on Ryan's negligence claim, which alleged that Thomas had a duty "to construct [her] home completely and free of defects," but that he breached that duty "by negligently constructing her home," thereby causing her "injury and damage." Dkt. 5, ¶¶ 7-9. The Policy defines "property damage"as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." Dkt. 9-3, at 24. Ryan's negligence claim can fairly be read as alleging that

Thomas's negligent construction caused physical damage to Ryan's home, thereby fitting within the Policy's definition of "property damage."[4]

The insuring agreement also requires that any alleged property damage be the result of an "occurrence." The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Dkt. 9-3, at 24. Although the Policy does not explain what is meant by the term "accident," the Montana Supreme Court has said that "[f]rom the standpoint of the insured, the term 'accident' reasonably refers to any unexpected happening that occurs without intention or design on the part of the insured." *Blair v. Mid-Continent Casualty Co.*, 167 P.3d 888, 891 (Mont. 2007).

Read this way, the term "occurrence" would encompass injury or damage accidentally resulting from negligent conduct. That faulty workmanship is an "occurrence" that may ultimately, under certain circumstances, be covered, is evidenced by the fact that the Policy contains a subcontractor exception to the "your work" exclusion, which otherwise precludes coverage for property damage

---

[4] In a footnote argument, Thomas maintains that the complaint's allegation of "injury" could "encompass 'bodily injury' to Ryan in the form of physical manifestations of emotional stress." Dkt. 13, 18 n. 5. But the complaint does not allege any facts whatsoever that would even suggest the possibility that Ryan claimed to be suffering from emotional stress or any other type of bodily injury. Accordingly, there is nothing to suggest that Ryan alleged "bodily injury" as required by the insuring agreement.

to the insured's completed or abandoned work.  *See Revelation Industries*, 206 P.3d at 928-29 (rejecting insurer's argument that faulty workmanship is not an "accident" and concluding that a similar subcontractor exception to the "your exclusion" satisfied the policy's "event" requirement).  Because Ryan's complaint alleged injury or damage as the result of negligent construction, it can reasonably be construed as alleging an "occurrence," as that term is defined by the Policy.

Nautilus's only argument to the contrary is misplaced.  Thomas maintains that Nautilus had a duty to defend him in the Ryan lawsuit because it knew he had allegedly "abandoned" the construction project, thereby giving rise to the possibility of coverage under the Policy's products-completed operations hazard provisions.  When it comes to the question of whether there was an "occurrence," Nautilus argues that "[t]o the extent Thomas now alleges that he decided to abandon his work on Ryan's home, that decision unequivocally is no accident," and there "would be no coverage for any alleged damages caused by that abandonment."  Dkt. 20, at 21-22.  But it was Thomas's allegedly negligent construction work, not his alleged decision to abandon the construction project, that constitutes an "occurrence" as defined by the Policy.

While the underlying complaint can fairly be read as alleging "property damage" caused by an "occurrence" as contemplated by the insuring agreement, if

any of the Policy's exclusions unequivocally precluded coverage then Nautilus would have had no duty to defend. Citing the Policy's business risk exclusions, Nautilus moves for summary judgment on this very basis.

To set the stage, Nautilus opens with the generally accepted principle that commercial general liability policies are not intended to cover an insured's faulty work. For example, Nautilus cites a leading insurance treatise for the proposition that commercial general liability policies are not designed to cover business risk, which occurs "as a consequence of the insured not performing well and is a component of every business relationship that is necessarily borne by the insured in order to satisfy its customers." 9A *Couch on Insurance*, § 129:1 (3d Ed. 1995). As Nautilus also notes, the Montana Supreme Court has discussed various so-called business risk exclusions with approval in other contexts, and indicated that those exclusions could, if applicable, preclude coverage for damage to an insured's work. *See e.g. Swank Enterprises, Inc. v. All Purpose Services, Ltd.*, 154 P.3d 52 (Mont. 2007); *Taylor-McDonnell Const. Co. v. Commercial Union Ins. Co.*, 744 P.2d 892 (Mont. 1987).

But the fact that commercial general liability policies contain enforceable business risk exclusions is not at issue. Instead, the issue is whether the business risk exclusions of the Policy under scrutiny unequivocally precluded coverage for

all of Ryan's claims, such that Nautilus did not have a duty to step in and assume Thomas's defense.

**B.      Exclusions j(5) & j(6): Damage to Property**

Nautilus begins by invoking exclusion (j), which bars coverage for various types of property damage.   In particular, Nautilus relies on exclusions (j)(5) & (6), which state that the insurance provided by the Policy does not apply to:

> **j.   Damage to Property**
>     "Property damage" to: ...
>
> (5)  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. ...
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."
>
> Dkt.  9-3, at 14-15.

By their terms, both of these exclusions apply only to damage that occurs while the insured's work is ongoing.   In exclusion (j)(5), it is the phrase "are performing operations" that makes this clear.  The exclusion bars coverage for damage to property on which the insured or any subcontractors "are performing operations."  If, however, the insured or its subcontractors are not "performing

operations," then this exclusion would not apply.[5]

Exclusion (j)(6) contains a similar temporal component, as evidenced by the fact that it expressly does not apply to property damage included in the products-completed operations hazard. The relevant portion of the Policy's products-completed operations hazard provision reads as follows:

> "Products-completed operations hazard":
> a. Includes all ... "property damage" occurring away from premises you own or rent and arising out of ... "your work" except: ...
> (2) Work that has not yet been completed or abandoned. ...
>
> Dkt. 9-3, at 24.

In other words, the products-completed operations hazard includes property damage arising out of "your work" if that work has "been completed or abandoned." Dkt. 9-3, at 24. "Your work" is defined elsewhere in the Policy as "[w]ork or operations performed by you or on your behalf...." Dkt. 9-3, at 25. Exclusion (j)(6) thus bars coverage for damage to "[t]hat particular part of any property that must be restored, repaired, or replaced because" the insured's work, or that of the insured's subcontractor, "was incorrectly performed on it." But the exclusion does not apply if that work has been completed or abandoned.

---

[5] *Couch on Insurance* explains that for these exclusions to apply, the claims must arise at the time the insured is actually performing work on the property. 9A *Couch on Ins.* § 129:20. But exclusions do not apply to claims that arise after the insured's operations are complete. 9A *Couch on Ins.* § 129:20.

For purposes of considering the applicability of these exclusions, the appropriate focus is on those allegations in the underlying complaint that were sufficient to trigger the insuring agreement in the first place.[6]  As discussed above, the only portion of the complaint that alleged "property damage" caused by an "occurrence" as contemplated by the insuring agreement was Ryan's claim that Thomas negligently constructed her home.  To the extent this claim might be read as alleging that Ryan's home was damaged while Thomas's work was ongoing, it falls squarely within the plain language of exclusions (j)(5) and (j)(6).

Ryan's complaint also alleged, however, that Thomas "did not complete the construction of her home."  Dkt. 5, ¶¶ 23, 28.  Although Ryan's complaint spoke only in terms of Thomas's failure to "complete" construction, Thomas argues the complaint can be construed broadly as alleging that he "abandoned" his work, thereby giving rise to the possibility of coverage for any subsequent property damage under the Policy's products-completed operations hazard provision.  Thomas maintains that the products-completed operations hazard provision thus "saves coverage on its face and Nautilus was under a duty to defend" once it received Ryan's complaint.  Dkt. 13, at 21.

---

[6] For those allegations that were not sufficient to trigger the insuring agreement, there could have been no coverage under the Policy.  The question of whether the exclusions apply to those allegations is thus irrelevant.

Even assuming the complaint could fairly be read as alleging that Thomas's negligent construction caused property damage that arose after he had abandoned his work, any such claim would be barred by exclusion (l).

**C.     Exclusion (l):  Damage to Your Work**

Commonly referred to as the "your work" exclusion, exclusion (l) states that the insurance provided by the Policy does not apply to:

> **l.  Damage to Your Work**
> "Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
>
> Dkt. 9-3, at 15.

Because it applies to property damage included in the products-completed operations hazard, this exclusion effectively precludes coverage for damages arising out of work by the insured that has been completed or abandoned.

According to Thomas, however, if the Policy's products-completed operations hazard provision applies, then exclusion (l) "is not in play."  Dkt. 22, at 10.  Apparently, Thomas believes that because he paid a separate premium for products-completed operations hazard coverage, any property damage that falls within the scope of the products-completed operations hazard provision is

automatically covered and the Policy's exclusions are irrelevant. But Thomas

does not cite to any legal authority or point to any language in the Policy that

would support such a reading. By its terms, exclusion (l) precludes coverage for

property damage to the insured's work that is included in the products-completed

operations hazard.

Accordingly, even assuming Ryan's complaint can be read as asserting that

Thomas's negligent construction somehow caused property damage that did not

arise until after he had abandoned the project, that claim would be unequivocally

barred by exclusion (l). Although exclusion (l) "does not apply if the damaged

work or the work out of which the damage arises was performed on [the insured's]

behalf by a subcontractor," nothing in Ryan's complaint implicated this exception.

Dkt. 9-3, at 15.

The only mention of "subcontractors" appears in Ryan's recitation of the

duty she claimed Thomas owed her. Dkt. 5, ¶ 7. In particular, Ryan alleged that

Thomas "had a duty to construct [her] home according to acceptable standards and

practices in the construction trade and industry, including, but not limited to,

complying with completion schedules in a timely manner, dealing with

governmental entities and agencies, subcontractors and suppliers of goods and

materials in a fair and reasonable manner, and to construct the home completely

and free of defects." Dkt. 5, ¶ 7. Ryan asserted that Thomas breached that duty by negligently constructing her home, but did not claim that any subcontractor had worked on the house, and offered no facts that would have suggested any subcontractor involvement. In other words, Ryan's complaint did not allege any property damage arising out of work "performed on [Thomas's] behalf by a subcontractor.

Collectively, then, exclusions (l), (j)(5) and (j)(6) squarely preclude coverage for the only claim in the underlying complaint that arguably satisfied the Policy's threshold insuring agreement – Ryan's claim that she suffered damage caused by Thomas's negligent construction. Because that claim was unequivocally excluded under the Policy, Nautilus did not have a duty to defend Thomas based on the allegations in Ryan's complaint. Had there been no further factual development, the analysis would end here and Nautilus would be entitled to summary judgment. But because Nautilus later acquired factual information that implicated the subcontractor exception to the Policy's "your work" exclusion, the discussion must continue.

In May 2010, after the Ryan litigation had been pending for more than two years, Thomas's counsel provided Nautilus with a copy of Ryan's responses to Thomas's first discovery requests. Dkt. 16-5. In one answer, Ryan stated that

Thomas had "walked off the job" and advised her "counsel that he had no intention of finishing the home....." Dkt. 16-5, at 6-7. And in response to an interrogatory asking her whether she claimed the house was defective in any manner, Ryan answered "Yes. It was unfinished, and there was a large crack on an interior wall." Dkt. 16-5, at 13. Thomas's counsel enclosed a letter along with the discovery responses, advising Nautilus that the construction defect for which Ryan was seeking recovery had been caused by McConnell, the sheet rock subcontractor. Dkt. 16-5. Citing the subcontractor's allegedly defective work, Thomas asked Nautilus to step in and assume the defense. Dkt. 16-5.

Read in conjunction with the underlying complaint, this extrinsic factual information was sufficient to trigger a duty to defend under the subcontractor exception to the "your work" exclusion. That exception preserves coverage for "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard,'" so long as "damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Dkt. 9-3, at 15. In other words, the Policy will cover property damage to an insured's completed or abandoned work "if the damaged work, or the work out of which the damage arises," was performed on the insured's behalf by a subcontractor. Dkt. 9-3, at 15.

Read in tandem with Ryan's complaint, the letter and discovery responses Nautilus received from Thomas in May 2010 implicated the subcontractor exception to exclusion (l) and alleged facts that, if proven, could have resulted in coverage. As of May 2010, Nautilus was on notice that Ryan was seeking to recover for property damage that may have arisen from work performed on Thomas's behalf by a subcontractor, and that may have arisen after Thomas allegedly abandoned the project. If proven, those facts could have resulted in coverage.

That Nautilus was aware of factual information giving rise to the possibility of coverage is reflected in the record. On June 1, 2010, a Nautilus adjuster noted that Thomas was seeking coverage based on the fact that Ryan was alleging property damage in the form of a large crack in the interior wall, and that the allegedly defective work may have been done by a subcontractor. The adjuster observed that counsel "may have a point" on the coverage argument because "[t]he 'your work' exclusion does not apply if the work is completed by the [insured's] subcontractor." Dkt. 16-7. As this entry reflects, Ryan's discovery responses and Thomas's letter raised the possibility of coverage based on application of the subcontractor exception to the "your work" exclusion.

Focusing on the meaning of the term "abandoned," however, Nautilus

disputes that coverage under the subcontractor exception was ever a possibility.

To support its reading, Nautilus relies on *Clarendon American Ins. Co. v. General Indemnity Company of Arizona*, 193 Cal. App. 4th 1311 (Cal. App. 2011), in which the court interpreted an identical products-completed operations hazard provision in a commercial general liability policy. In that case, a homeowner hired an insured contractor to build a residence, but fired the contractor before the home had been completed. *Clarendon*, 193 Cal. App. 4th at 1314. The court concluded that the policy's products-completed operations hazard provision did not apply because the project had not been abandoned. *Clarendon*, 193 Cal. App. 4th at 1319. In doing so, the court construed the term "abandoned" as requiring that "both sides to [the] contract expressly announce their intention to abandon it, releasing both sides from their respective duties under the contract." *Clarendon*, 193 Cal. App. 4th at 1319. Nautilus advocates for a similar reading here, arguing that the Policy's products-completed operations hazard provision could not have been "triggered by Thomas unilaterally deciding to stop work on the Ryan project." Dkt. 20, at 17.

*Clarendon* is both distinguishable and unpersuasive. For one thing, neither party in *Clarendon* abandoned the construction project – the insured was fired, and the homeowners expressly retained their rights under the contract. *Clarendon*, 193

Cal. App. 4th at 1319.  Here, however, Ryan alleged that Thomas walked off the job without completing his work and she had to hire other contractors to finish the project.  Dkt. 5.  There was nothing to suggest that Ryan expressly retained any of her rights under the contract.

The Policy does not define the term "abandoned," which can reasonably be read to have two meanings in the context of the products-completed operations hazard provision.  The term could, for example, be read as requiring only that the insured have "abandoned" its work, or as requiring that all parties to the construction contract have "abandoned" the project.   Where, as here, the terms of an insurance contract are reasonably subject to two different interpretations, those "must be strictly construed against the insurer and in favor of extending coverage."  *Stutzman*, 945 P.2d at 34.

Applying that construction here, the Policy's products-completed operations hazard provision would apply if, as alleged by Ryan in her discovery responses, the insured had "abandoned" its work.   Those discovery responses, in conjunction with Thomas's letter, gave Nautilus notice of facts which, if proven, could have resulted in coverage based on application of the subcontractor exception to the Policy's "your work" exclusion.  Because it was no longer unequivocally clear once Nautilus received those materials that coverage for Ryan's claim was entirely

precluded, Nautilus's duty to defend was triggered at that time. Unless coverage was unequivocally precluded by another exclusion, Nautilus was under a duty to step in and defend Thomas in the Ryan lawsuit.[7]

## C. Exclusion (m): Damage to Impaired Property or Property Not Physically Injured

Nautilus also moves for summary judgment based on exclusion (m), which precludes coverage for damage to impaired property or property not physically injured. But because that exclusion does not apply, it is of no help to Nautilus. Exclusion (m) provides as follows:

> **m.** **Damage To Impaired Property Or Property Not Physically Injured**
>
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden an accidental physical injury to "your product" or "your work" after it has been put to its intended use.
>
> Dkt. 9-3, at 15.

---

[7] As discussed above, exclusions (j)(5) and (j)(6) would not apply to that particular claim, because they only serve to preclude coverage for damage that occurs while the insured's work, or that of its subcontractors, is ongoing.

By its terms, exclusion (m) applies only to property damage to "impaired property" or "property that has not been physically injured." The Policy defines "impaired property," as "tangible property, other than 'your product' or 'your work', that cannot be used or is less useful" for various reasons. Dkt. 9-3, at 22. Because all of the work at issue was completed either by Thomas or a subcontractor, it constitutes "[y]our work" as defined by the Policy.[8] This means that there was no "impaired property" involved to which exclusion (m) might apply.

Exclusion (m) might nevertheless apply if the "property damage" Ryan alleged in the underlying lawsuit was to "property that ha[d] not been physically injured." Dkt. 9-3, at 15. The Policy does not define the term "physically injured." In her discovery responses, Ryan alleged physical damage to the building's interior walls, thereby fitting within the usual, common sense meaning of the term "physically injured."

In its reply brief, Nautilus concedes that "[e]xclusion (m) does not preclude coverage for all of Ryan's claims against Thomas" because "[s]ome of Ryan's claims against Thomas are based on property that has been physically injured due

---

[8] The Policy defines "[y]our work" as "[w]ork or operations performed by you or on your behalf." Dkt. 9-3, at 25.

to deficient work by Thomas and/or his subcontractors." Dkt. 20, at 16. But Nautilus stands by its position that those claims "are excluded from coverage by exclusions (j)(5) and (j)(6)." Dkt. 20, at 16. As discussed above, however, Nautilus is only partially correct.

The Court agrees that, as pled in the underlying complaint, Ryan's claim of property damage caused by Thomas's deficient work was unequivocally barred by exclusions (j)(5), (j)(6) and (l). But once Nautilus learned that Ryan was also seeking to recover for property damage that may have arisen after the project was allegedly abandoned and may have been caused by a subcontractor's negligent work, exclusions (j)(5), (j)(6) and (l) were no longer applicable and Nautilus's duty to defend was triggered.

To the extent Nautilus maintains that exclusion (m) precludes coverage for Ryan's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, constructive fraud, or conversion, its argument is essentially moot. As discussed above, none of those claims was sufficient to trigger the Policy's insuring agreement because they did not allege "property damage" caused by an "occurrence." Thomas has effectively conceded as much, and does not argue that those claims gave rise to a duty to defend.

It was only upon receiving Ryan's discovery responses and the letter from

Thomas's counsel that Nautilus learned of facts which, if proven, could have resulted in coverage based on the subcontractor exception to the Policy's "your work" exclusion. Once Nautilus's duty to defend was triggered with regard to that claim, Nautilus had a duty to step in and assume the defense of all claims. *See e.g. Grindheim v. Safeco Ins. Co. of America*, 908 F.Supp. 794, 802 n. 10 (D. Mont. 1995) (explaining that "[t]he duty to defend with respect to a particular complaint is 'triggered' regardless of the fact that only a portion of the complaint alleges facts, which if proven, would result in coverage."); *Home Ins. Co. v. Pinski Brothers, Inc.*, 500 P.2d 945-50 (Mont. 1972).

Nautilus breached its duty to defend by refusing to assume the defense even after it received Ryan's discovery responses and the letter from Thomas's counsel. While it can be said as a matter of law that Nautilus breached its duty to defend, the extent of damages to which Thomas is entitled as a result of that breach remains to be determined.

## IV.    Conclusion

For all of the above reasons,

IT IS RECOMMENDED that Nautilus's motion for summary judgment be DENIED, and Thomas's cross-motion for partial summary judgment be GRANTED to that Nautilus had a duty to defend Thomas that arose upon its

receipt of Ryan's discovery responses and Thomas's correspondence.

DATED this 24th day of August, 2011

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge